In re the CANYON PARTNERSHIP, a
California Limited Partnership,
Debtor.

Bankruptcy No. 85–00131–P11.

United States Bankruptcy Court,
S.D. California.

Nov. 21, 1985.

Charles Christopher, San Diego, Cal., for debtor.

Steven B. Dillaway, San Diego, Cal., trustee.

## MEMORANDUM OPINION RE SALE OF REAL ESTATE BY TRUSTEE

### I.

### INTRODUCTION

JOHN J. HARGROVE, Bankruptcy Judge.

The Canyon Partnership, a California Limited Partnership (hereinafter "Debtor") filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code on January 10, 1985. By written Stipulation between all of the partners of the Debtor and Barclay's Bank of California (hereinafter "Bank"), Steven B. Dillaway (hereinafter "Trustee") was appointed as Chapter 11 Trustee on February 26, 1985. Thereafter, on September 26, 1985, the Trustee filed an Application to Sell Real Property.

The Trustee's Application came on for hearing on October 25 and 30, 1985 and on November 8, 1985. Pursuant to Bankruptcy Rule of Procedure 7041 and Federal Rule of Civil Procedure 41(b) the Debtor moved for a dismissal of the Trustee's Application. This Court denied the Debtor's Motion on the ground that the Trustee had submitted sufficient facts which would entitle him to the relief sought in his Application. The Debtor thereafter presented its evidence in opposition to the Trustee's Application and rested its case. The Application was then taken under submission and this opinion sets forth this Court's decision in the case.

### II.

### STATEMENT OF FACTS

The Debtor is a California Limited Partnership whose sole asset consists of approximately 910 acres of undeveloped real property located several miles east of Escondido, California in the San Pasqual area near the San Diego Wild Animal Park and contiguous to the Cleveland National Forest.

On January 12, 1985, one day after the filing of the Chapter 11 Petition by the Debtor, Mr. David C. Pierson (hereinafter "Pierson"), Mr. David J. Williams (hereinafter "Williams"), and Williams and Pierson, a General Partnership (hereinafter "W & P"), which was the Debtor's sole general partner prior to the filing of the Chapter 11 proceeding, gave a written "Assignment of Interests and Claims" (hereinafter "Assignment") to the Bank of "any and all of their

right, title and interest to any and all proceeds, profits, distribution, compensation, return of capital and any other monies'' due to Pierson, Williams and W & P from the Debtor. W & P as general partner of the Debtor owned a 50% interest in the Debtor at the time of the Assignment to the Bank. Additionally, a limited partner of the Debtor, the San Luis Rey, a General Partnership (hereinafter "San Luis Rey") assigned its two units, constituting 16.67% of the partnership interest in the Debtor, to the Bank. Consideration for the Assignments included, among other things, the Bank's reconveyance of its beneficial interest under a Deed of Trust secured by the Debtor's real property, which had been recorded on July 13, 1982 to secure an obligation of approximately $248,500.00 owed to the Bank by the Debtor.

On October 18, 1985 the Bank, as holder of a 66.67% interest in the Debtor filed its written "Notice of Nonopposition to the Trustee's Application to Sell Real Property".

## TRUSTEE'S TESTIMONY

At the evidentiary hearings on the Application, the Trustee, who is a licensed attorney, C.P.A. and a real estate broker, and who has had experience as either a Trustee or Examiner in cases which were somewhat similar to the present case, testified that shortly after his appointment as Trustee on February 26, 1985, he began to evaluate alternative possible dispositions of the Debtor's real property. The Trustee testified that in early April he contacted the attorney for the Bank to obtain marketing information that the Bank possessed concerning the property. The Trustee also contacted Pierson and requested marketing materials which the Debtor had previously developed regarding the property. The Trustee also testified that in June of 1985 he spoke with Williams regarding the possibility of having the Partnership provide the Trustee with additional funds in order to market the property but that Williams indicated to him that the partners did not want to put any additional cash into the estate.

The Trustee also testified that his investigation revealed that there was no cash in the estate nor any other assets other than the Debtor's real property. Further, the Trustee found that a first Trust Deed given as security against the Debtor's real property, and securing a Note with a principal balance of approximately $412,000.00, had been delinquent since November, 1984, and that the partners did not want to make any further payments to the Trust Deed holder. The Trustee also discovered that the 1984/1985 real estate taxes on the real property had not been paid.

Additionally, the Trustee testified that commencing sometime in April, 1985 he contacted an agent of John Burnham & Company, a local major real estate broker, regarding the marketing of the Debtor's real property. On July 10, 1985, the Trustee signed a written Exclusive Sales Listing Agreement with John Burnham & Company (hereinafter "Broker") and listed the real property at a selling price of $950,-000.00. This Court approved the Application of the Trustee to Employ the Broker on July 23, 1985.

The Trustee testified that he was aware that marketing packages were sent out by the Broker to contiguous property owners and others, but that he had received only one phone call concerning inquiry as to the subject property. This sole phone call was received on November 8, 1985, at approximately 10 minutes before the Court hearing, from a person who refused to leave any return address or phone number. The Trustee also testified that he had commenced purchase negotiations with a Mr. Roger Steppe, a contiguous property owner and the proposed purchaser in the present transaction, towards the end of July, 1985. He testified that Mr. Steppe was referred to him by W & P as the most logical buyer for the Debtor's real property.

The Trustee described the Debtor's real property as being located in an isolated area with rugged terrain characterized by abrupt soles, bluffs and canyons, water shed and desert lands and susceptible to fires and erosion.

The Trustee also testified that on July 30, 1985, he personally visited the Debtor's property with Mr. Steppe, the possible purchaser of the subject property, and with representatives of the Broker. The Trustee further described the terrain as "landlocked" from city or county paved roads with the only access to the property being over an unpaved truck trail which proceeds partly over Mr. Steppe's real property and then over public domain property. The Trustee further testified that in his opinion it would require substantial legal and engineering expense to investigate and substantiate a purported prescriptive easement to the Debtor's property through the contiguous pieces of property. He testified that he had asked W & P and also the Bank whether they would be willing to retain legal counsel and/or contribute money for this purpose and that all refused. The Trustee also indicated that in his opinion it would require substantial sums to upgrade the existing truck trail as well as locating and marking an existing 100 foot wide easement over part of the truck trail through Mr. Steppe's property.

The Trustee then concluded that based on his investigation it would be in the best interest of the estate to sell the property to Mr. Steppe and accordingly he signed a written Real Estate Purchase Agreement with Mr. Steppe on August 8, 1985.

The pertinent portions of the Purchase Agreement provide for a purchase price of approximately $662,000.00 including a cash down payment in the amount of $50,000.00 with the buyer to assume the existing first Deed of Trust in the approximate amount of $412,000.00. The Trustee would then carry back a second Deed of Trust securing a Note in the amount of $200,000.00. The Note is to be non-interest bearing for two and a half years with a $10,000.00 principal reduction at the end of 12 months from the close of escrow followed by a $5,000.00 principal reduction at the end of 18 months and another $5,000.00 principal reduction at the end of 24 months from the close of escrow. Thereafter, the Note is to bear interest at the rate of 10% per annum payable, in quarterly interest only installments

or more, for a period of five years following the close of escrow at which time the remaining principal balance plus accrued interest would be all due and payable. The Trustee also indicated that the real estate commission to be paid on the transaction would be only $20,000.00 as opposed to the listing agreement of eight percent (8%) of the gross sales price, or $52,960.00.

The Trustee also recommended at the evidentiary hearing on November 8, 1985, that the proposed sale could be made subject to overbid in increments of $50,000.00.

OBJECTIONS TO PROPOSED SALE

Objections to the Trustee's proposed sale were filed by the Debtor, by its general partner Pierson, and by three limited partners whose limited partnership interests collectively account for a 20% ownership interest in the Debtor (hereinafter referred to collectively as the "Objecting Parties"). The Objecting Parties contend that the proposed sale price is inadequate and that the terms of the sale are not in the best interest of the estate.

Specifically, the Objecting Parties contend that testimony given during the hearing by experienced real estate appraiser Gerald S. Kibbey, M.A.I. and a written appraisal dated February 22, 1983 prepared by the firm of Gerald S. Kibbey & Associates, Inc. support their contention that the subject property had a fair market value of $1,365,000.00 and a "liquidation value" of $950,000.00. Additionally, the Objecting Parties, through the Declaration of Williams, contend that the subject property is not in fact "landlocked" as the Trustee asserts, but that it is accessible through prescriptive easements over contiguous properties and a 100 foot legal easement over the contiguous property owned by Steppe.

The second point submitted by the Objecting Parties concerns the terms of the sale of the subject property to Mr. Steppe. Specifically, the Objecting Parties contend that that portion of the Purchase Agreement whereby the Trustee will receive a

$200,000.00 Note secured by a Deed of Trust on the subject property with no interest for 2½ years results in the Trust Deed Note only being worth 35%–50% of the face amount of the Note. Additionally, the Objecting Parties assert that the terms of the Purchase Agreement to Mr. Steppe are not in the best interest of the estate because the second Deed of Trust to be received by the Trustee apparently is a Purchase Money Deed of Trust, which precludes the Trustee from recourse against Mr. Steppe individually in the event of a default in payment.

## III.

## DISCUSSION

■ 11 U.S.C. Section 363(b)(1) provides:

"The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

Under Section 363 of Title 11, Congress gave trustees broad power to sell property of an estate and provided for the safeguarding of interests other than those of the bankruptcy estate. The section clearly indicates that the manner of sale is within the discretion of the Trustee and that any such sale is not a judicial sale as was the case under Section 70 of the Bankruptcy Act. *In re Alisa Partnership*, 15 B.R. 802 (Bkrtcy.D.Del.1981).

■ In this Chapter 11 proceeding, the Trustee is a licensed attorney, C.P.A. and real estate broker and experienced Trustee who decided that the present sale to Mr. Steppe, an owner of contiguous real property, is in the best interest of the estate, even though the proposed sales price of approximately $662,500.00 is 70% of the $950,000.00 "liquidation value" testified to by Mr. Kibbey, the expert real estate appraiser. This Court concurs with the Trustee's opinion for the following reasons:

According to a Grand Deed located in the Addendum of the Appraisal which was offered into evidence at the evidentiary hearings on this matter, the subject property was acquired by an entity known as "The Canyon Partnership" on June 8, 1978. Based on other evidence submitted at the evidentiary hearings by the attorney for the interested party Bank, the present limited partnership was formed on or about January 1, 1981. The Trustee testified that the first Trust Deed with a principal balance of approximately $412,000.00 was in default and has been delinquent since November, 1984. He also testified that the estate has no cash nor any other assets nor is there any income stream being generated from this subject property with which to service the secured debt on the property or pay current real estate taxes. The Trustee further testified that he made inquiry as to Pierson and Williams, the general partners of the Debtor, and also to representatives of the Bank, to see if any of them would be willing to contribute funds to the Trustee so he could proceed to develop the property further; his inquiries were met with refusals.

The Court has also taken judicial notice of the entire bankruptcy file, including the Debtor's Schedules,[1] and notes that there are only two general non-insider unsecured creditors in the case whose claims amount to $1,550.35. In all likelihood, these unsecured creditors will be paid in full from the cash proceeds to be received from the sale by the Trustee, after deducting the Broker's commission of $20,000.00 and administrative expenses of this estate.

The Court also took note of the fact that although this proceeding was instituted on January 10, 1985, neither the Debtor nor the objecting limited partners had filed a Plan of Reorganization in the proceeding. Further, the Court considered the fact that Pierson and Williams, the general partners of the Debtor, by virtue of a written Stipulation and Order for Appointment of Trus-

---

1. See *In re Leach,* 35 B.R. 100 (Bkrtcy.W.D.Ky. 1983) for further discussion regarding a Bankruptcy Court's authority to take judicial notice of the entire bankruptcy file during an adversary proceeding.

tee signed by this Court on November 26, 1985, assigned all of their rights to payment from the Debtor to the Bank and expressly stipulated that neither they nor W & P "no longer have any economic stake in the Debtor by virtue of such assignments". Additionally, the Bank also received an assignment of all rights to payments from limited partner, San Luis Rey which held a 16.67% interest in the Debtor. As noted earlier, the Bank also filed with the Court a Notice of Nonopposition to the Trustee's Application to Sell the Subject Real Property.

The Court is further satisfied with the marketing efforts relating to the subject property and notes the Trustee did employ a well known and experienced real estate brokerage house to assist him in his marketing efforts. The Court also notes that the Broker has agreed to reduce its commission from the customary 8% of the gross selling price, or some $52,960.00, to $20,000.00.

Further, the Court finds that the Trustee's testimony concerning the marketing difficulties associated with the Debtor's real property is meritorious. The Trustee testified that the subject real property is landlocked, meaning that it is without reasonable access. His testimony was supported both by the appraiser and by the testimony of Pierson and the Declaration of Williams. The Trustee indicated that in his opinion it would cost close to $100,000.00 to complete a dirt jeep trail to make access to the subject property reasonable. Pierson concurred with this figure in his testimony, although the Declaration of Williams disputes the $100,000.00 cost in making the road somewhat passable; Williams does admit that the cost to complete the trail would approximate $43,000.00.

Additionally, Williams indicated that the subject property could be developed and ready for sale at a cost of about $180,000.00. Williams indicates that this would result in the property having twenty-two forty acre parcels and that parcels of this size would sell at about $60,000.00 a parcel so that the value of the property would be worth $1,320,000.00. The Court, however, notes that the limited partners and the Bank, to wit the parties in this proceeding which will receive the benefit of this proposed infusion of capital, are not willing to contribute any further capital to the Trustee despite his inquiry in this regard.

Although the issue before this court is a Trustee's Application to Sell Real Property, rather than a creditor's Motion to Dismiss, the principles enunciated in *In re Alison Corp.,* 9 B.R. 827 (Bkrtcy.S.D.Cal.1981) have direct bearing in the present case. As the court in *In re Alison Corp.* stated, one basic purpose of the Bankruptcy Code was to give the debtor a "fresh start". The court then went on to state that:

> In a chapter 11 context, this fresh start can be characterized as rehabilitation through the implementation of a plan of reorganization whereby the debtor will emerge as a functioning unit in the economy.

> Another main thrust of the bankruptcy system is the orderly amassing of the nonexempt assets of the debtor and equitable, systematic distribution to creditors. *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 514, 15 L.Ed.2d 428 (1966); *Kokoszka v. Belford,* 417 U.S. 642, 645–646, 94 S.Ct. 2431, 2433–34, 41 L.Ed.2d 374 (1974).

> In a Chapter 11 context, this is accomplished through the plan of reorganization after it passes the scrutiny of the Court and the votes of any creditor class whose claims or interests are impaired. See 11 U.S.C. Sections 1124, 1126. The debtor or its equity holders are the last category of persons or entities which the code is designed to benefit. 11 U.S.C. Section 1129; 5 *Collier on Bankruptcy,* Par. 1129.03[4][d] (15th Ed.1980); 11 U.S.C. Section 726.

*In re Alison Corp., supra* 9 B.R. at 829.

In the present case, there are two small unsecured creditors who will more than likely be paid in cash in full upon the completion of the Trustee's sale. Here, as in *In re Alison Corp.,* there is no prospect of a fresh start being promoted, since the

Debtor only has this single asset. The only reason that the Debtor and the limited partners are objecting to the Trustee's sale is so that these equity security holders of the Debtor, at creditors' risk, can retrieve their investment and obtain the appreciation value of the property. Apparently, as in *In re Alison Corp.*, the equity holders propose to do this without footing the bill, which would include servicing the debt against the real property, paying the real property taxes and paying the unsecured creditors.

Based upon the facts and evidence as discussed, this Court finds that the proposed sales price is fair and reasonable and that the sale is in the best interest of the estate and of the creditors.

This Court further finds that the facts in this case and the above stated principles enunciated in *In re Alison Corp.* support the proposed sale of the Debtor's sole asset on the terms and conditions set forth in the Trustee's Application.

At the evidentiary hearing on November 8, 1985, the Debtor proposed overbid increments of $20,000.00 in the event this Court decided to approve the Trustee's proposed sale.

The Court approves the Trustee's Application to Sell Real Property subject to overbid in increments of $20,000.00 cash. The Trustee shall renotice the sale as being approved by this Court but subject to overbid. The Trustee shall further advertise the sale in a major newspaper in San Diego County.

The Trustee shall immediately set a sale date in this Court no earlier than 30 days after the date of this decision. The attorney for the Trustee will prepare and lodge an appropriate Order within 10 days from the filing of this Opinion.